IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MARY MARGARET NUNEZ

                   Plaintiff,                     OPINION AND ORDER

    v.

                                                  11-cv-218-wmc

Carolyn Colvin,
Acting Commissioner of Social Security,[1]

                        Defendant.

      This is an action for judicial review of an adverse decision of the Commissioner of Social Security brought pursuant to 42 U.S.C. § 405(g). Plaintiff Mary Margaret Nunez seeks reversal of the commissioner's decision denying her disability insurance benefits and supplemental security income because she is not disabled. Nunez contends that the administrative law judge (ALJ) erred (1) in failing to consider the uncontroverted opinion of an examining physician, and (2) in finding that she could perform her past relevant work as a screen operator. The court agrees that the ALJ failed to provide an adequate explanation for rejecting the opinion of the examining physician and did not make the necessary findings of fact with respect to the demands of Nunez's past work. Accordingly, it will remand this case to the commissioner for further proceedings consistent with this opinion.


FACTS[2]

A. Background

      Mary Nunez was born on April 5, 1979, and graduated from high school. AR 41. She has past work experience as a certified nursing assistant and a screen operator. AR 24-26.

---

[1]The court has revised the caption to reflect the fact that Carolyn Colvin replaced Michael Astrue as the Acting Commissioner of Social Security after this case was filed.

[2]The following facts are drawn from the administrative record (AR).

On November 22, 2006, Nunez filed applications for disability insurance benefits and supplemental security income, alleging disability as of June 30, 2006, due to attention deficit hyperactivity disorder (ADHD), a learning disability, bipolar disorder and schizophrenia. AR 118-23, 158, 163.  In conjunction with her application, she filed reports indicating that she could care for her children, perform routine household tasks, use public transportation, and play cards and video games.  AR 171-172, 180.

After the local disability agency denied Nunez's application, both initially and upon reconsideration, she requested a hearing, which was held on November 17, 2009, before Administrative Law Judge Stephen Algren.  The ALJ heard testimony from Nunez.  AR 41-61.  On February 17, 2010, Judge Algren issued his decision, finding plaintiff not disabled.  AR 19-27.  This decision became the final decision of the commissioner on February 5, 2011, when the Appeals Council affirmed.  AR 1-2.

### B. Medical Evidence

#### 1. Dr. David Geske

On November 2, 2006, Nunez saw a board certified psychiatrist, David Geske.  He assessed her with major depression with psychotic features.  Nunez admitted that she had not been compliant with treatment options.  Geske adjusted her medications.  AR 250-51.

Nunez returned to see Dr. Geske on November 9, 2006, because of concern over her medications.  Geske diagnosed her with major depression, recurrent with psychotic features and further adjusted her medications.  AR 252.

2.  <u>Dr. George Melnyck</u>

On February 8, 2007, Nunez saw Dr. Melnyck, a psychiatrist.  At the time, Nunez reported that her main problem was irritability and that she was not taking the medications Dr. Geske had prescribed.  Melnyck prescribed Prozac and Klonopin for Nunez.  AR 287. On April 12, 2007, Nunez returned to see Melnyck complaining of anxiety, in response to which he prescribed Xanax.  AR 288.

On September 27, 2007, Nunez reported to Dr. Melnyck that she had not been taking her medications.  He diagnosed her with mood disorder, not otherwise specified with cluster B traits, and prescribed Gabitril.  AR 538.  When she returned to see Melnyck in January 2008, Nunez was pregnant and had been taking her mother's Klonopin.  Melnyck advised her to stop taking Klonopin immediately because it could cause birth defects.  He suggested BuSpar instead.  AR 539.

In October of 2008, Nunez reported having mood swings and occasionally hearing voices.  Even so, she reported no problems taking care of her 7 week old twins.   On examination, Dr. Melnyck noted that her concentration, attention, insight and judgment were adequate.  He prescribed Abilify and recommended counseling.  AR 541.


3.  <u>Dr. Tracy Warsing</u>

On July 19, 2007, Nunez saw her primary care physician, Dr. Tracy Warsing for reevaluation of her medications, including the Concerta that she had been taking for attention deficit disorder (ADD).  Warsing noted that Nunez had less anxiety and emotional irritability than during past visits.  AR 397.

When Nunez saw Dr. Warsing in April of 2008, she was taking her Prozac more regularly, which seemed to improve her mood significantly.  AR 469.  Nunez returned to see Warsing shortly after she delivered twins on September 2, 2008, and reported that Prozac was working well for her.   On examination, Nunez's mood was good and affect was appropriate.  AR 466.

In December of 2008, Nunez saw Warsing again, reporting that Prozac, Abilify and Clonazepam were working well for her.  AR 436.  In March of 2009, Dr. Warsing noted Nunez seemed to be managing well overall, but increased her Clonazepam dosage.  AR 503.

In June of 2009, Nunez saw Dr. Warsing for reevaluation of her medications.  At that time, Nunez reported significant social anxiety, although the Clonazepam had helped with her irritability.  Warsing noted that Nunez was doing well overall but was off work due to psychological issues.  AR 492-93.  In an undated note, Warsing stated that Nunez is diagnosed with bipolar personality and anxiety disorder.   Warsing also noted that Nunez did not have a "definitive" diagnosis of schizophrenia.  AR 312.

C.  Consulting Physicians

In March of 2007, James Hobart, Ph.D., examined Nunez at the request of the state agency.   Nunez reported having social anxiety, anger, visual hallucinations and hearing voices in her head.  AR 258-59.  Testing revealed that Nunez had a verbal IQ of 77, a performance IQ of 78 and a Full-Scale IQ of 76, which indicated borderline intellectual functioning.  AR 261.  Hobart separately interviewed Nunez's mother, who indicated that

Nunez needed her help with cooking, managing money and organizing her household.  The mother also stated that Nunez did not always understand recipes.  AR 260-61.

At that time, Hobart diagnosed Nunez with "Major Depressive Disorder with psychotic features and borderline personality features and borderline intellectual functioning."  AR 262.  He further concluded that given her long-standing difficulties and lack of response to medication, her prognosis was "guarded to poor."  With respect to work capacity, Hobart noted the following:

> She may have some difficulty understanding, remembering and carry [ing] out simple work related instructions particularly given mother's description of her not understanding some recipes and things of that sort.  She clearly has problems responding appropriately to supervisors and co-workers and has lost numerous jobs because of her temper outbursts.  Concentration, attention and work pace are likely adequate.  However, she will have difficulty withstanding routine work stresses and adapting to change.

AR 262.

On April 12, 2007, state agency psychologist Eric Edelman completed a psychiatric review technique form for Nunez, finding that she had an affective disorder and borderline intellectual functioning.  AR 267.  He found that Nunez had mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and no episodes of decompensation.  He also noted that there was no evidence of the "C" criteria.  AR 277-78.  Edelman also completed a mental residual functional capacity assessment for Nunez, finding without explanation that she was not significantly limited in her ability to carry out very short and simple instructions.  He found her moderately limited in her ability to (1) understand, remember and carry out detailed instructions; (2) maintain attention and concentration for

extended periods; (3) work in coordination with or proximity to others without being distracted by them; (4) complete a normal work day and work week without interruptions from psychologically-based symptoms; (5) perform at a consistent pace without an unreasonable number and length of rest periods; (6) interact appropriately with the general public; (7) accept instructions; (8) respond appropriately to criticism from supervisors; and (9) get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  AR 281-83.  On September 26, 2007, a state agency psychologist, Michael Mandli, affirmed Edelman's assessments.  AR 293.


D.  <u>Hearing Testimony</u>

At the hearing, Nunez testified that she received her Certified Nursing Assistant license in December 2003 and worked as a certified nursing assistant at the Tomah Health Care Center as recently as February 2008.  AR 42.  Nunez also testified that this job was difficult for her  because she was unable to follow simple instructions.  AR 43.

Nunez testified that she had problems with anger and mood swings.  She had seen Dr. Melnyck for these issues but was not comfortable talking to him.  She last saw Melnyck in the spring of 2007.  AR 44.  At the time of the hearing, Nunez was seeing only Dr. Warsing, her medical doctor, who prescribed Prozac and Klonopin for her.  AR 45.  Nunez testified that the medications helped her symptoms.  AR 47.

Nunez testified that she cared for her six children, cooked, did laundry and walked to the grocery store.  AR 50.  She also has a boyfriend who works at Fort McCoy.  AR 51.

Nunez testified that she has held a number of jobs, but for only short periods of time, and has been fired from several of them for absenteeism, arguing with coworkers and falsifying a doctor's note.  AR 52-55.  In 2005, she worked third shift in the screening department at Northern Engraving, where she picked up items from a long washer and put them on a pallet.  She liked that job best because she did well and there were not a lot of other people around.  It only took her a few minutes to learn the job, but in a given night they may have had 10 different screening jobs.  Because every screening job required her to do something differently, the supervisor would have to show her what to do, something that was not done for other employees.  Nunez only had one conflict with a coworker while working in the screening department.  She left that job when she became pregnant.  Nunez testified that she probably could do the job if it were currently available.  AR 51-52, 59-61.

## E.  ALJ's Decision

Although the ALJ found that Nunez was severely impaired by an anxiety disorder with depression and Cluster B personality traits, he determined that none of those impairments, individually or in combination, met or medically equaled any impairment listed in 20 C.F.R. 404, Subpart P, Appendix 1.  The ALJ also found that Nunez had moderate restrictions in the activities of daily living, social functioning and maintaining concentration, persistence or pace.  Further, he found that Nunez had no episodes of decompensation and no evidence of "C" criteria.  AR 21-22.

The ALJ ultimately found that Nunez retained the residual functional capacity (RFC) to perform a full range of work at all exertional levels as long as it was routine, low stress

work that does not require frequent contact with the public or co-workers.  AR 23.  He also noted the medical evidence indicated that Nunez had a history of mental health issues, and had been treated for both depression and anxiety, but that anxiety and difficulty controlling her anger were her primary issues.  The ALJ explained that these mental health issues had improved with medication, but that Nunez had not been compliant with her treatment.  As support for his conclusion that Nunez was not precluded from performing routine, low stress work, the ALJ relied upon Nunez's admitted activities, including caring for her young twins, performing routine household tasks, using public transportation, shopping without assistance, and playing cards and video games.  AR 25-26.

The ALJ also considered but rejected the opinion of Dr. James Hobart, a consulting psychologist, that Nunez would have difficulty understanding, remembering and carrying out simple work related instructions.  Instead, the ALJ found that Hobart's opinion was not supported by the overall objective medical evidence of record, which showed Nunez had borderline intellectual functioning.  AR 26.  The ALJ then concluded that Nunez was not disabled because she could perform her past relevant work as a screen operator.  AR 26.

OPINION

The standard by which a federal court reviews a final decision by the commissioner is well settled:  the commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  When reviewing the commissioner's

findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).

Nevertheless, the court must conduct a "critical review of the evidence" before affirming the commissioner's decision, *id.*, and the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). When the ALJ denies benefits, he must build a logical and accurate bridge from the evidence to his conclusion. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). This was not accomplished by the ALJ's decision.

## A.  Dr. Hobart's Opinion

Nunez contends that the ALJ erred in determining her mental residual functional capacity by failing to account for Dr. Hobart's opinion that Nunez might have some difficulty understanding, remembering and carrying out simple work-related instructions. Although the ALJ mentioned this opinion of Dr. Hobart, he rejected it. The ALJ's complete explanation, for doing so, however, is puzzling at best: "given the fact [Nunez] was found to have borderline intellectual functioning, the undersigned notes [and] [Hobart's] conclusion [are] not supported by the overall objective medical evidence of record." AR 26.

Instead, the ALJ found the state agency physician's contrary opinions to be persuasive in the absence of a treating physician opinion regarding Nunez's work limitations.

By itself, a contradictory opinion of a non-examining physician is not enough to support the rejection of an examining physician's opinion. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). The general rule is that opinions from sources who have treated the plaintiff are entitled to more weight than non-treating sources, and opinions from sources who have examined the plaintiff are entitled to more weight than opinions from non-examining sources. 20 C.F.R. §§ 404.1527(c)(1) and (2), 416.927(c)(1) and (2). The ALJ should also consider the source's medical specialty and expertise, supporting evidence in the record, consistency with the record as a whole and other explanations regarding the opinion. *Haynes v. Barnhart*, 416 F.3d 621, 630 (7th Cir. 2005); 20 C.F.R. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6).

As Nunez argues, the ALJ's finding is conclusory. Indeed, his adoption of Edelman's evaluation over Hobart's concerns is flawed at the outset because Hobart actually examined Nunez and Edelman does not explain why he assigned greater ability to follow instructions than found by Hobart a month earlier. The ALJ also failed to account for the multiple opinions of substantial, at times apparently debilitating, mental health limitations noted by Nunez's treating physicians, Drs. Geske, Melynck and Warsing, or explain how a person with borderline intellectual functioning could perform simple work in combination with these mental health issues. Ultimately, the ALJ's comments suggest that he may have been substituting his own view of the evidence for that of the treating physicians and Dr. Hobart, which would be improper. *See Similia v. Astrue*, 573 F.3d 503, 507 (7th Cir. 2009) (ALJ

10

must refrain from "playing doctor").  The ALJ also failed to identify what other (if any) "medical evidence of record" he considered that outweighed Dr. Hobart's findings.  As a result, the ALJ's failure to adequately explain his rejection of Dr. Hobart's opinion is a sufficient reason to reverse the commissioner's decision and remand this case.

## C.  Step Four

Nunez contends that the ALJ also erred in determining that she could perform her past relevant work as a screen operator because he failed to assess the activities of the job and compare them to Nunez's RFC.  In his decision, the ALJ wrote that "[i]n comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed." AR 26.  In support of his finding, the ALJ noted only that Nunez had described the job as simple and routine and requiring no more than occasional contact with coworkers.

"To determine whether a claimant can perform past relevant work, an ALJ must compare the demands of the claimant's past occupation with his or her present capacity." *Steward v. Bowen*, 858 F.2d 1295, 1299-1300 (7th Cir. 1988).  According to SSR 82-62, the ALJ must obtain sufficient information about skill level, exertional demands and nonexertional demands of the claimant's past work to permit a decision about whether the claimant can return to the same job.  SSR 82-62 also states that:

> Adequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations. Detailed information about strength, endurance, manipulative ability, mental demands and other job requirements must be obtained as appropriate. This information will be derived from a detailed description of the work obtained from the claimant, employer, or other informed source.

11

Information concerning job titles, dates work was performed, rate of compensation, tools and machines used, knowledge required, the extent of supervision and independent judgment required, and a description of tasks and responsibilities will permit a judgment as to the skill level and the current relevance of the individual's work experience.  In addition, for a claim involving a mental/emotional impairment, care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g., speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work.

While SSR 82-62 goes on to state that the claimant is the primary source for vocational documentation -- and that statements by the claimant regarding past work are generally sufficient for determining skill level, exertional demands and nonexertional demands of such work -- the ALJ's decision also must contain *specific findings* with respect to the individual's RFC, the physical and mental demands of the past job and whether the individual's RFC would permit a return to his or her past job or occupation.  *Id.*

Although the ALJ mentioned that Nunez's past work was simple and routine, he made no findings in his decision as to the stress level of the job or the impact of Nunez's mental health issues on her ability to perform.  Further, Nunez did not state that she had infrequent contact with the public and coworkers; her testimony was that there were few people around.  On remand, the ALJ should take care to adhere to the requirements of SSR 82-62 and make specific written findings concerning the skill level and physical and mental demands of Nunez's past job as compared to her current RFC.  Although Nunez may be the best source for information on the requirements of her past work, the ALJ might also benefit from contacting Nunez's past employer, using a vocational expert or referring to the *Dictionary of Occupational Titles*.

ORDER

IT IS ORDERED that the decision of defendant Carolyn Colvin, Acting Commissioner of Social Security, is REVERSED and REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  The clerk of court is directed to enter judgment for plaintiff Mary Margaret Nunez and close this case.

Entered this 23rd day of December, 2013.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge